MILBURN AND OTHERS, Respondents, v. HORTIZ, Appellant.

1. The confirming force of the act of Congress of June 13, 1812, extends to common field lots, out-lots, &c., as well without as within the survey of the outboundary line of the town of St. Louis, the plat of which survey is commonly known as " Map X."

*Appeal from St. Louis Land Court.*

This was an action of ejectment, brought by William Milburn and others, as commissioners appointed by the St. Louis County Court under authority of an act of the general assembly of March 3, 1851, to recover possession of part of the 16th section in St. Louis township.   On the trial below, plaintiffs adduced the following evidences of title :

1. Act of Congress of March, 6, 1820, entitled " An act to authorize the people of Missouri territory to form a constitution and state government," giving to the state, on certain conditions, the 16th section of each township.

2. An ordinance of July 19, 1820, declaring the assent of the people of the state of Missouri to the foregoing act of Congress.

3. The act of the general assembly of Missouri of March 3, 1851, " to authorize the sale of fractional section 16, township 45 north, range 7 east."

4. The order of St. Louis County Court appointing plaintiffs commissioners to take possession, &c.

5. A certified copy of the plat of survey of township 45 north, range 7 east.   It was proven that defendant was in possession of a portion of section 16.

6. Plaintiffs offered in evidence a certified copy of the plat of survey approved 1840, purporting to be a survey of the outboundary line of the town of St. Louis, made by authority of the act of Congress of June 13th, 1812, which plat is commonly known as " Map X."   Defendant objected to the introduction of this plat as irrelevant and incomplete.   The objection was overruled.

Defendant, to maintain the issue on his part, offered parol and documentary evidence to prove that the land described in the petition, and of which the defendant had possession, was part of a common field lot, containing one arpent in front by forty in depth, in the Grand Prairie common field belonging to the town of St. Louis ; that said common field lot was one of a series of lots lying adjacent to each other in the same general range in the Grand Prairie, and in the vicinity of the town or village of St. Louis ; that said lots were possessed and cultivated by the inhabitants of said town or village in a common field prior to the 20th of December, 1803 ; that said common field lot of one by forty arpens was possessed and cultivated by Francis Bequette, an inhabitant of said town, prior to said 20th of December ; that he and his representatives claimed the said common field as owners ; that said Francis Bequette died, and that defendant is in possession of the part of the said common field lot sought to be recovered in this suit under title derived from the legal representatives of said Bequette, (of whom defendant is one,) and that defendant holds possession thereof under said title. The court, on the objection of plaintiffs, excluded this evidence on the ground that said common field lot and common field were outside of the survey of the outboundary line of the town of St. Louis, given in evidence. Defendant admitted that said common field is outside of said outboundary line.

Defendant also offered to prove that said survey of the said outboundary line was incorrect in material particulars, and that the outboundary line, directed to be run by the act of Congress of June 13th, 1812, never has been surveyed or run as directed by said act. This evidence was, on the objection of plaintiffs, excluded. A verdict was rendered for plaintiffs.

*S. Reber, P. C. Morehead, C. C. McClure*, for appellants, cited Page v. Schiebel, 11 Mo. 167 ; Page v. Harrison, 16 Mo. 182 ; Eberle v. The Schools, 11 Mo. 247 ; Trotter v. The Schools, 9 Mo. 69 ; Gurno v. Janis, 6 Mo. 330 ; Soulard v. Clark, 19 Mo. 570 ; City of Carondelet v. McPherson, 20

Mo. 192; Strother v. Lucas, 12 Peters, 410; Chouteau v. Eckhart, 2 How. 344; Guitard v. Stoddard, 16 How. 494.

*R. M. Field,* with whom were *W. L. Williams* and *B. Bates,* insisted that the outboundary line, established by the surveyor general pursuant to the first section of the act of 13th June, 1812, is conclusive upon all parties claiming a confirmation by force of that section; and that no person, claiming title under that section alone, can be permitted to locate any of the enumerated subjects of confirmation beyond that outboundary line. In regard to confirmations of single tracts to claimants, the doctrine of the Supreme Court of the United States has settled conclusively the effect of an official survey upon the rights of a party claiming under such confirmation. In the case of Cochran v. West, (17 How. 403,) it was declared that the party confirmed must take such location as was made by the executive department having charge of the surveys; and it was said in that case to have been always the policy of the United States to give defined limits, by survey, to all public grants of lands. This case really went no further than the previous cases of LeBois v. Bramell, (4 How. 449,) and Menard v. Massey, (8 How. 293.) The same doctrine has been laid down by the same court in the recent case of Kissell v. Public Schools, in which case it is declared with clearness and distinctness that the ascertainment of the true location of a vague and indefinite grant of land by act of Congress falls within the province of the executive department alone, and that the judiciary department, whether state or national, has nothing to do with the matter. The decisions of the Supreme Court of the United States, in regard to the subject under consideration, are conceived to go to this extent, that the boundaries of a tract of land, of vague or uncertain limits, granted or confirmed by the United States, are, according to long established public policy, to be surveyed so as to show the line of separation between what is granted or confirmed and what is still retained as public domain; and that the execution of this duty is in its nature purely executive, with which the judiciary department,

state or national, has no concern whatever. The courts of Missouri have nothing to do but to apply these plain principles; and surely there is no doubt or difficulty in their application to the case at bar. The United States, by act of Congress of 13th June, 1812, confirmed to the inhabitants of the town of St. Louis their town lots, out-lots, common field lots and commons, according to possession, inhabitation or cultivation prior to the 20th December, 1803, and ordered the same to be surveyed by the public executive officer by one outboundary line, run in such manner as to include all the subjects of confirmation in one mass, just as they were confirmed. The Supreme Court of the United States, in Mackay v. Dillon, (4 Howard, 446,) speaking of this survey, says : " The object of this proceeding, on the part of the government, was to sever the confirmed claims, in a mass, from the remaining lands of the United States and others outside of the boundary, and nothing more." Now, it is perfectly plain that if the outboundary line, when run, did not answer the purpose just mentioned, it answered no purpose whatever, and it was labor thrown away to run it at all. Practically, the court is asked by the appellant to obliterate the outboundary line from the books of the land office. If Congress, by the act of 1812, had granted the site of the town of St. Louis to some one person, and had directed it to be surveyed by its officer, the case would then have fallen at all points within the decision of Cochran v. West. Where is the logician that can distinguish the case just assumed and the one at bar ? An indefinite number of inhabitants claim parts of one large tract of land having vague and undetermined boundaries. The government grants the whole according to the several claims, and directs at the same time that the whole shall be surveyed in one mass, so as to include all the parts. What kind of a survey is that which includes the whole and does not include its parts ? A case could scarcely be imagined where the necessity of a public, authoritative survey would be more essential than in the case of these confirmations by the first section of the act of 1812. The town and all its parts are con-

firmed according to actual inhabitation, cultivation and posses-
sion.  Nothing could be more vague and indefinite.  As part
of this grant, it is provided that the public officer shall survey
and mark its outboundary.  If the survey, when made, does
not mark the limits of the grant, how are they to be ascertain-
ed ?  If the surveyor general of the United States, under the
authority of Congress, can not run this outboundary, who else
can do it ?  Ingenious counsel have argued that the object of
the survey, provided by the first section of the act of 1812, was
to limit the reservation for the public schools made in the sec-
ond section of the act.  But surely this can not be so.  The
second section may be stricken out of the act, and the end to be
answered by the survey still remains, just as it was stated by
the Supreme Court in Mackay v. Dillon.  The appellant says
that Congress gave him a common field lot in 1812, and he
thinks it hard that a surveyor should take it away by running a
line in 1840.  This is a common argument.  The counsel made
use of it in the case of Cochran v. West.  They said Brazeau
had a title to the sixteen arpens *north of the ditch* in 1811, by
the judgment of the commissioners, and no surveyor could
annul this title by running lines *south of the ditch* in 1850.
The answer of the Supreme Court was that the true location of
his land under his grant depended on the lines to be run by the
surveyor.  In the present case, it is not necessary to deny
that the appellant was proprietor of a common field lot belong-
ing to St. Louis that was confirmed by the act of 1812.  Let
him look for his land within the lines established by the gov-
ernment.

SCOTT, Judge, delivered the opinion of the court.

The question presented by the record for our determination
does not, in our opinion, involve the necessity of an examina-
tion of the correctness of the survey of the outboundary of St.
Louis, made by the officers of the general government.  We
will therefore proceed at once to an examination of the point on

which the cause turned below, viz., that a common field lot of the village of St. Louis, lying beyond the outboundary above referred to, was not confirmed by the act of the 13th June, 1812.

In all the litigation which has grown out of that act—and it is believed that it has given rise to more than any law, state or federal, which has been in force here—an instance is not recollected in which it was maintained that a survey of the outboundary of the village of St. Louis was a muniment of the title of a private claimant to a lot confirmed by the act of 1812. Inhabitation, cultivation or possession prior to the 20th of December, 1803, by an inhabitant of the village, was all that has been supposed was necessary to be proved in order to maintain or defend an ejectment for a common field lot claimed under the act of 1812. That act, in its terms, requires no such thing. The confirmation of the claims of individuals is made directly and absolutely, without any reference to an outboundary. The language of the act is, that the rights, titles and claims to town or village lots, common field lots, &c., shall be and the same are hereby confirmed to the inhabitants of the respective towns or villages. Afterwards, it is made the duty of the principal deputy surveyor to survey the outboundary lines of the several towns or villages, so as to include the out-lots, common field lots and commons thereto respectively belonging. If a common field lot belonging to one of the enumerated villages is confirmed by the act, can the failure of the deputy surveyor to include it in his survey take away the claimant's right to it? The fact that no survey of the outboundary was made until twenty-eight years after the passage of the act, ought to be deemed conclusive on this question. It has always been supposed that the idea of an outboundary was suggested by the reservation made by the act for the use of schools, which being limited to one-twentieth of the area within the boundary, it was necessary in order to ascertain which were the lands reserved for schools. Had there been no reservation for schools, no outboundary would have been thought of, nor would any have

been required. Such has been the practical construction of the act of 1812, and it would now be unsafe to depart from it, as many titles may repose on the belief of its correctness. Had the idea possessed the mind of Congress that a lot must have been within an outboundary in order to have been confirmed, what would have been more natural than first to have required the survey of such a boundary, and then to have declared that all out-lots, common field lots, and commons, within the same, should be confirmed to the inhabitants of the respective villages and towns? Instead of this, they confirm the inhabitants in their rights, and then require the outboundary to be surveyed, so as to include them. How unwise it would have been to have given the inhabitants lots, and then to have conferred on the principal deputy surveyor an absolute power to take them away by his survey at any time thereafter, even after the lapse of twenty-eight years. Believing that the idea of an outboundary had its rise in the reservation for the use of schools, there is nothing, in our opinion, which would warrant us in making it interfere with the claims of private individuals. Had a correct outboundary of the village been surveyed immediately after the passage of the act, there would have been but little hardship in holding claimants to it; but to require it now, for the first time, more than forty years after the passage of the act, as a muniment of title, might disturb many titles and produce a wide field for litigation.

In the case of Kissell v. The Public Schools, (18 Howard, 218,) the Supreme Court of the United States says : " It is proper to remark that we are here dealing with the survey marked ' X' (which is the survey in question) and ascertaining its effect as regards the lands granted and allotted for school purposes, and are not to be understood as having expressed any opinion on the effect of this outboundary survey on titles situated beyond it and claimed to have been confirmed by the act of 1812, or which were subject to be identified by the recorder of land titles under the act of 1824." Adopting the opinion which is here only intimated, we, on the

other hand, in giving our judgment in relation to the question involved in this controversy, do not wish to be understood as expressing any opinion in relation to the question, how far the disregard of the survey, in determining the rights of individuals under the act of 1812, will affect the public schools? In saying that individuals are not confined within the limits of the outboundary, we do not wish to be understood as expressing the opinion that the schools are also at liberty to depart from those limits, and claim a new survey of the outboundary.

The other judges concurring, the judgment will be reversed, and the cause remanded.

