Glasgow et al. v. Lindell's Heirs.

WILLIAM GLASGOW *et al.*, Appellants, *v.* PETER LINDELL'S HEIRS, Respondents.

1. *Limitations — Section 16 of St. Louis township — Action brought under act of March 3d, 1851.—* The commissioners appointed by the County Court of St. Louis county, under the general assembly act of March 3d, 1851, had power to sue in their own names for possession of a tract of land embraced in fractional section sixteen of St. Louis township, although the statute gave them no legal right to the land. In such suit these commissioners, although suing in their own names, acted simply as agents of the State, and against the State no limitation ran, under the law as it then stood. And there is nothing to prevent the Legislature from passing a law authorizing agents created for the recovery of these lands from suing in their own names.

2. *Laws — Repealed by implication, when only.—* Repeals by implication are not favored or allowed unless the first act be so inconsistent as not to stand with the subsequent act.

3. *Lands and land titles — Common-field lots — Occupancy under act of 1812 — Surveys, etc.—* It is the settled construction of the act of Congress of June 13, 1812, that by its own terms this act vested in each inhabitant of the town of St. Louis the absolute title in fee to the common-field lot which he possessed or cultivated prior to December 20, 1803. There was no condition of survey necessary to vest title. If the surveyor general assumed to survey any of the lots by metes and bounds as they existed in Spanish times, such surveys would be evidence, not to establish but to ascertain the lots as originally defined upon the ground. But in making such surveys he must be governed by the old Spanish monuments.

In case of undefined tracts of land, under acts of Congress confirming claims and requiring surveys, no title passes until the survey is made. But a common-field lot either exists upon the ground by defined limits or it has no existence at all, and cannot be created by survey.

4. *Lands and land titles — Common-field lots — Occupancy prior to December, 1803 — Schools.—* Only such of the field lots in the Grand Prairie common fields of St. Louis, cultivated by the inhabitants of St. Louis prior to the 20th of December, 1803, as might be assigned, not exceeding a certain amount, were reserved for the support of the schools.

5. *Practice, civil — Instructions, etc.—* An instruction which assumes all the facts and leaves nothing for the jury is bad.

6. *Act of 1812 — Cultivation and possession, ownership presumed from.—* In ejectment setting up title to land in St. Louis township common fields, evidence that the land had been " cultivated and possessed " under the act of 1812 would be sufficient without further positive proof that the possessor had " claimed " it. The presumption of ownership would arise without such additional proof.

Glasgow et al. v. Lindell's Heirs.

*Appeal from St. Louis Circuit Court.*

*Glover & Shepley*, and *Hamilton*, for appellants.

I. It has long been settled that the act of Congress of March 6, 1820, and the ordinance of July 19, 1820, operated as a direct grant by Congress to the State, and vested in the State a complete title to section sixteen, for township schools, as soon as surveyed, unless the title had previously passed out of the United States. (Payne *et al.* v. St. Louis County, 8 Mo. 476; Kennett v. Cole County, 13 Mo. 139; State v. Dent, 18 Mo. 313; State v. Ham, 19 Mo. 592.)

II. The validity of the act of the Legislature of March 3, 1851, was somewhat questioned in the court below, but it is expressly decided in Payne *et al.* v. St. Louis County, *supra*, that the Legislature of the State have the power to provide for leasing and selling the school lands and applying the proceeds to the object of the grant; that such legislation amounts to no breach of trust; and see Maupin v. Parker, 3 Mo. 310.

III. The object of the act, and the powers expressly conferred upon these commissioners, render it perfectly clear that it was intended that all suits for the recovery of the possession of the property should be brought in the names of the commissioners. These commissioners are made the statutory agents of the law for this very purpose among others, and, as such, are armed with all the powers of the State which may be necessary for the discharge of the duties enjoined upon them, that enables them thus to sue. While a private agent may sue only in the name of his principal, yet where a statute authorizes an agent to sue he may do so in his own name. Whenever a statute gives a right or imposes a duty, it also confers by implication the power necessary to make the right available or to discharge the duty. Jackson v. Reynolds, 14 Johns. 335, illustrates this distinction between a public and a private agency. In Overseers v. Overseers, 18 Johns. 418, the court lays down the general principle for which we are contending, in this language: "There can be no doubt that when a public office is instituted by the Legislature, an implied authority

is conferred on the officer to bring all suits as are incident to his office, which the proper and faithful discharge of the duties of his office requires." To the same effect are: Inhabitants, etc., v. Wood, 13 Mass. 198 ; Todd v. Birdsall, 1 Cow. 260, and notes ; Grant v. Faucher, 5 Cow. 311; Supervisor v. Stimson, 4 Hill, 136 ; Page v. Fazackerly, 36 Barb. 395, and cases cited by the court; Trustees of Schools v. Tatman, 13 Ill. 29 ; Carruthers v. Bailey, 3 Kelly, 105, and Rogers v. White, 1 Sneed, 72. The right of these commissioners to sue in their own names is now for the first time questioned, although this litigation has been pending for nearly twenty years.

IV. The act of 1851 (Sess. Acts 1851, p. 706) was not repealed by that of January 31, 1865 (Sess. Acts 1865, pp. 337–9). It was shown on the trial that the county of St. Louis had other lands besides this section sixteen. There can be no difficulty in so reconciling these two statutes that they may stand together. Repeal by implication is not favored. (Brown v. Crawford County, 8 Mo. 642; City of St. Louis v. Alexander, 23 Mo. 501; Sedgw. Stat. and Const. Law. 127.)

V. Sanguinet was the only witness produced in reference to the cultivation of the land in controversy prior to 1803. He could not say anything of any particular lot as cultivated by any particular person. He knew nothing of the lines of the sixteenth section. Defendants say that the ground in dispute was cultivated by somebody, but by whom they do not prove, and therefore there was a confirmation to somebody—to some of the inhabitants *en masse*—and, consequently, that the plaintiffs cannot recover. But there can be no confirmation *en masse* of common-field lots. (See Act of June 13, 1812.) The law has long been settled that some particular person must have cultivated some particular lot, with ascertainable limits, prior to December 20, 1803, and was claiming the same at the passage of the act of June 13, 1812, or there was no confirmation. (Page v. Schibel, 11 Mo. 183 ; Papin v. Hines, 23 Mo. 277.) A confirmation to a tract of land by metes and bounds which cannot be identified by evidence is like a confirmation without any metes and bounds ; therefore such a confirmation is not a title to any land. It will be found on

Glasgow et al. v. Lindell's Heirs.

examination of the recorder's proofs and certificates of the Bouis and Baccanne tracts, that there is no such description of metes and bounds as, under the evidence in the case, will locate either of them. As to the Bizet arpent the case is equally plain. There is no proof of any cultivation prior to December 2, 1803, by any witness at the trial. There is no proof under the act of Congress of 1824. There is only a confirmation of July 4, 1836. As to the necessity of a definite location under the act of 1812, in order to pass title by confirmation, see United States v. Delespine, 15 Pet. 319; United States v. Lawton, 5 How. 28; Watts v. Lindsey's Heirs, 7 Wheat. 159; Littlepage v. Fowler, 11 Wheat. 216; Lecompte v. United States, 11 How. 115; Bissell v. Penrose, 8 How. 317; Stanford v. Taylor, 18 How. 411; Menard's Heirs v. Massey, 8 How. 293; Guitard v. Stoddard, 16 How. 512; West v. Cochran, 17 How. 403; Ledoux v. Black, 18 How. 473; Carondelet v. St. Louis, 1 Black, 189.

VI. There is no defense by limitation to this suit. Our title was in the State till 1851. This suit was brought in 1853. No limitation runs against the State. (7 Mo. 194; 19 Mo. 607.)

VII. To vest title in village schools the surveyor-general is, under the acts of Congress, to survey the lot and assign it to the schools. There are many decisions on school titles. Not one was ever rendered that any title passed without a designation of the particular lot claimed by the schools, or without any assignment made out and delivered by the surveyor-general. (Kissell v. Schools, 18 How. 19.) And the plainest answer to the pretense of outstanding title in the school is that no assignment has been made by the surveyor-general to the schools. (Papin v. Ryan & Walker, 32 Mo. 21.)

*B. A. Hill*, for respondents.

I. This act of 1851 makes the commissioners attorneys in fact for the County Court, and gives them no further authority than that of mere agents to act under the direction and approval of the County Court; and the County Court has been for many years general attorney in fact for the State in regard to school lands. (See R. C. 1825, '35, '45 and '55.) The act of 1851 does

not vest any title in the plaintiffs, nor authorize them to sue in their own names ; nor could it do so, for the State is a naked trustee, and the County Court is the attorney in fact for the State in regard to the school lands, while the inhabitants of the township are the beneficial owners. The State could not authorize the County Court to appoint commissioners to sell the school lands in any township without the consent of the inhabitants, who were the beneficial owners ; but if power of sale could be delegated by the State without the consent of the inhabitants of the township, the legal title must still be in the State, and the beneficial ownership in the inhabitants. But the Legislature nowhere attempts to delegate the trust confided to the State by Congress, even by implication, but manifestly appoints the County Court as the most appropriate agent for the faithful execution of such trust.

"The only proper plaintiff in an action for the recovery of real estate is the party holding the legal title, although such party may be only the trustee of an express trust." (Boardman v. Beckwith, 18 Iowa, 292 ; Winters v. Rush, 34 Cal. 126 ; Weaver v. Wabash Canal, 28 Ind. 115 ; Balcombe v. Northrup, 9 Minn. 172 ; Tyler Eject. 52 ; Tiff. & Bull. Trust. 811 ; Gardner v. Armstrong, 31 Mo. 535 ; Fenn v. Holme, 21 How. 481 ; Smith v. McCann, 24 Mo. 398 ; Governor v. Ball, 1 Hemp. 541 ; State v. Bradish, 34 Verm. 419 ; State, to use, etc., v. Fleming, 19 Mo. 608 ; Stevens v. Brown, 32 Mo. 176.) This legal title has never passed, and the State holds it now, if any exists, under the grant for schools. The commissioners are not the real parties in interest, nor are they trustees of an express trust within the meaning of the statute, because, even if the State had the power to transfer its trusts, there are no words or intention expressed to do so, and such trust cannot be created except by an express agreement or express words to that effect. (Robbins v. Dwerill, 20 Wis. 148 ; Lewando v. Dunham, 1 Hill, 114.) "A mere agent or attorney in fact is not a trustee of an express trust and cannot sue in his own name." (Rawling v. Fuller, 31 Ind. 255.) "One who is described in an instrument as the attorney in fact of another, does not hold the character of a trustee." (Powell v. Ross, 4 Cal. 197.)

This suit ought to have been brought in the name of the State of Missouri, to the use of the inhabitants of township 45. Being brought in the name of the commissioners, who have no interest, title or estate whatever, legal or equitable, in the land sued for, the suit should be dismissed.

II. The legal title to the land is in the owners of the common-field lots, which cover all the land sued for. No title ever passed to the State of Missouri for any of the lands sued for, if they were otherwise disposed of by any law of Congress, or act of the government or its officers, prior to 1820. (See Bissell v. Penrose, 8 How. 317; Wilcox v. Jackson, 13 Pet. 498.) A title to land becomes a legal title when a claim is confirmed by Congress. Such confirmation is a higher evidence of title than a patent, because it is a direct grant of the fee which had been previously in the United States. (See 16 How. 494; 1 Black, 590; 2 How. 319, and case cited in opinion.) The land sued for by plaintiffs is covered by the confirmations in the Grand Prairie common fields belonging to St. Louis, to Bouis, Baccanne and Bizet. [Counsel here reviewed at length the evidence bearing upon these confirmations.]

No condition of survey was annexed to the grants of June 13, 1812. That act passes a present title, *proprio vigore*, of the property described to the persons designated. (See Glasgow & Taylor v. Hortiz, 1 Black, 595; West v. Cochran, 17 How. 417; Carondelet v. St. Louis, 25 Mo. 462; Pacific R.R. v. Lindell, 39 Mo. 329.) There is no such thing as a vague grant in the common fields. There could be no such thing. Each lot was surveyed in Spanish times, marked with corner-stones, and subject to charges by order of the syndics in the village. (Mackay v. Dillon, 4 How. 421.)

*Trusten Polk*, for respondents, filed an elaborate brief embracing substantially most of the points presented by Hill.

ADAMS, Judge, delivered the opinion of the court.

This was ejectment, commenced in September, 1853, in the St. Louis Land Court by plaintiffs, as commissioners appointed by

the County Court of St. Louis county, against Peter Lindell in his lifetime, who died, and the suit was revived against the defendants as his heirs. It is for part of the sixteenth section of township 45 of range 7 east of the fifth principal meridian.

The defendants, by their answer, denied the plaintiffs' right to bring the suit; admitted possession of so much of the premises as lay south of a line running easterly and westerly, and parallel with the south line of the Central or Olive street Plank road, and 150 feet distant therefrom, but claimed to be the owners thereof in fee, by virtue of confirmations and grants under the act of Congress of the 13th of June, 1812, and other acts therein referred to, and to have held possession thereof as such owners for more than twenty years before the commencement of this suit.

The trial was had in the St. Louis Circuit Court, and on the 7th of May, 1870, plaintiffs recovered a triangular parcel of 35.076 acres bounded south by survey 903, in the name of widow Camp, west by the west line of said section sixteen, and north by the south line of survey 1665, in the name of Louis Laroche. The whole of the land recovered lies within the St. Louis common field of the Grand Prairie, and includes portions of the common-field lots confirmed to the legal representatives of Vincent Bouis, of Baptiste Riviere *dit* Baccanet, and of William Bizet. The defendants appealed to the general term, where the judgment of the court at special term was reversed, and from this judgment the plaintiffs appealed to this court.

On the trial the plaintiffs gave the following evidence in support of their title, to-wit: (1) The act of Congress of the 6th of March, 1820, for the admission of Missouri into the Union. (2) The ordinance of the 19th of July, 1820, declaring the assent of the people of Missouri to the said act of the 6th of March, 1820. (3) The act of the general assembly, approved the 3d of March, 1851, for the sale of section 16, township 45, range 7 east, found in Session Laws of 1851, p. 706. (4) The order of the County Court of St. Louis county, appointing plaintiffs commissioners to take possession of said section sixteen under said act of assembly. (5) A certified copy of the field-notes and plat of survey of section 16, township 45, range 7

east, by Joseph Brown in 1818. (6) An authenticated copy of plat of township 45 north, range 7 east of the fifth principal meridian, in the county of St. Louis, showing the lines of section sixteen sued for, and the tracts of Bouis, Baccanet, Bizet and widow Camp, under whom the defendants claim. (7) Section 107, chapter 34, General Statutes of 1865, p. 212, defining the boundaries of St. Louis county. (8) Section 10 of the act of Congress of the 3d of March, 1811 (2 U. S. Stat. at Large, 664, 665). (9) The county surveyor's plat of survey of the premises in dispute, and the report accompanying the same, made in obedience to the order of survey in the case. (10) The plaintiff examined Julius Pitzman, county surveyor of St. Louis county, who pointed out the lines and corners of said section sixteen on the map, and testified to finding of the corners on the ground by running lines according to the field-notes of the survey of this tract and adjoining tracts. (11) The possession of the premises in dispute by Peter Lindell, the original defendant at the time the suit was commenced, was admitted. (12) The plaintiff examined William H. Cozzens, who gave evidence showing the existence of section 16, township 45 north, range 7 east, by defined metes and bounds and the corners and lines of said section. He also gave evidence on cross-examination tending to show that Peter Lindell, the original defendant, entered about the year 1836, and held possession thereafter until his death; and he had heard from old Frenchmen that all the region round about had been cultivated. (13) The plaintiff put in evidence the map exhibiting the outboundary of St. Louis, known as map X. [Plaintiffs here closed.]

The defendants then asked, and the court refused, the two following instructions, viz: 1. "If the court, sitting as a jury, finds from the evidence that the original defendant, Peter Lindell, was in actual possession of the premises sued for, from and after the year 1836 until the commencement of this suit, then the plaintiffs have shown no title or right to sue in this action in their own names as commissioners of the sixteenth section." 2. "There is no evidence before the court to show that these plaintiffs have any right to recover in this action against those of the defendants who have answered in this cause."

On the refusal of these instructions the defendants introduced their evidence, and called Charles Sanguinet, who testified, in substance, that he was past 87 years of age; was born in St. Louis; knew the Grand Prairie common fields; they were cultivated in Spanish times by different persons who lived in St. Louis; this cultivation extended from the Motard tract in the *cul de sac* up north to the St. Charles road, and seven or eight concessions beyond it; these cultivations adjoin each other, and were from one to one and one-half arpens wide and forty arpens deep, and the front of these lots was straight and uniform; was twelve years old when he first observed these cultivations; they were before and down to 1803; at this last date was twenty years old; could not remember the cultivators, but recollect Marie as one of them.

Robert Forsyth testified to the effect that he had lived in St. Louis since 1812; Lindell took possession in 1826 or 1827; he didn't all at once, but occupied and inclosed different pieces every year; had a large tract inclosed in 1833; he inclosed portions of the Baccanet, Bouis and Provenchere tracts prior to 1837; Bouis was living on his tract; from 1835, down to the present, Lindell and his heirs had possession, by inclosure, from the center of Laroche tract down to Deschamp, Mullanphy's inclosure.

Wm. H. Cozzens testified: Recollect, in 1836-7, an old inclosure around the Corneau Springs (describing it and its position); also Alexis Marie's improvement; have seen the remains of Marie's house; the north line of that old inclosure was the south line of the Laroche tract, which is the north line of the Vincent Bouis tract; this ancient inclosure included the Corneau spring, and extended a half arpen south of it; the remains of the old house are on the north part, at the edge of the cultivation; found the ancient stones on the east ends of these lots, being the east of the St. Louis common fields of the Grand Prairie; the ancient French witnesses who were present showed me the east front line of these common fields, extending from Cass avenue down to the little "run" of *cul de sac*, having Spanish landmarks and stones with iron dross under them; have found similar stones on the west line of the Grand Prairie common fields, which is parallel to the

east line; they were Spanish; describes how he ascertained the local-
ities of the lots he surveyed; as deputy U. S. surveyor he made the
survey in the Grand Prairie of the St. Louis common fields; com-
menced at the well-known corner of Mainville *dit* Deschenes, in
the center of Cass avenue, and ran south to the Chouteau mill
tract, which was south of the Madame Camp survey, and found
the corners of the common-field lots all the way down; they were
old stones with cinders under them; the east line was uniform
and straight all the way down to said mill tract; in 1845–6 had
made his surveys, which were approved and recorded in the sur-
veyor-general's office, and gave the surveyor-general a complete
history of them; had all the old French witnesses on the ground,
and in their presence found, on the continuation (southwardly)
of the east front line of the Grand Prairie common fields, the old
stones down to said mill tract; the marks of the ancient cultiva-
tion were still visible, were visible on the Corneau lot, which is
next south of the Bizet lot; surveyed the Bizet and the Bouis and
the Baccanet lot, as well as those north of them; there were also
common fields north of Mainville Deschenes; the Grand Prairie
common fields consisting of lots conceded to individuals; they
were oblong and parallel and forty arpens deep, and adjoining
each other, and belonged to the inhabitants of St. Louis, who
cultivated them; besides the commons of the Grand Prairie there
were those of the St. Louis Prairie (next west of the town), of
the Little Prairie (south of it), of the Prairie des Noyers (west
of the common), and of the *cul de sac* (south of the Grand Prai-
rie). Witness pointed out on the plat in evidence the south line
of the St. Louis commons, the west line of the common fields of
the Prairie des Noyers, of the *cul de sac* and of the Grand Prai-
rie, and said no other line would include the town of St. Louis,
its common fields and common, and the land in controversy is
within this line; no out-boundary was run including the com-
mon fields of the Prairie des Noyers and the other common
fields; but an out-boundary survey was constructed by adopt-
ing surveys for that purpose which had been previously made;
he first surveyed the tracts of Bouis, Baccanet and Bizet, nine
arpens and thirty-six feet west of the east front line of the com-

mon fields, but this was not done of his own accord, but by directions of the surveyor-general; afterwards, in 1855, he set the surveys of them forward to the said front line of the common fields, and those surveys were approved by that officer; but afterwards, in 1857, he put them back by instructions from the surveyor-general, nine arpens and thirty-six feet.

Levin H. Baker testified: I am nephew of Peter Lindell, deceased; came here in 1831, and resided here ever since; have known the Lindell farm since 1831; knew the Corneau spring; the ancient fence was two arpens west of it, three arpens east, and four or five south of it; the inclosure was continued and repaired from time to time until the commencement of this suit; after Mr. Lindell bought the Bouis tract he took possession and cultivated it; he repaired the fence that ran along the center of the Laroche lot; it ran in a straight line until it enters into the north line of the Camp tract, then east with this line to the northeast corner, thence south with Camp's east line to the southeast corner, thence west with Camp's south line its whole extent, thence inclosing the Hunot New Madrid location, and around this to the beginning.

The defendants introduced documentary evidence as follows: The confirmation papers by Recorder Hunt, June 1, 1825, to the legal representatives of Vincent Bouis, of the common-field lots in Grand Prairie two arpens in front by forty deep, bounded north by the field lot formerly owned by LaBarge, south by the field lot formerly owned by John B. Provenchere, east and west by public land. The testimony of Aug. Chouteau shows that this is the field lot which had first been cultivated by Marie, who sold to P. Chouteau, who sold to Bouis' heirs; and the testimony of Sanguinet on the trial showed the cultivation of Marie.

Then the survey of this confirmation No. 1813, made by said Cozzens and approved May 31, 1855, by the surveyor-general. This survey is not pushed back from the east front line of the common fields nine arpens and thirty-six feet, but its east front line is the east front line of the Grand Prairie common fields, extending down southwardly from Mainville *dit* Deschenes, in Cass avenue.

Instructions to Wm. H. Cozzens, dated 9th of May, 1846, by Conway, surveyor-general. In these instructions he is told that the end lines are to be continuations of the southeast and north-west boundaries of surveys 1296, 1461, 3303, 3304, 1561, 1583, 3285, which commenced at the offset at Mainville Deschenes, and extends southwardly, or rather southeasterly, in a straight line.

Also a public notice of same date, by Surveyor-General Conway, published in the *Missouri Republican*, that these, with other surveys, were to be made by said Cozzens.

The confirmation papers by Recorder Hunt to legal representatives of Baptiste Riviere *dit* Baccanet, under the acts of June 13, 1812, and May 26, 1824, of a field lot in Grand Prairie of 1 by 40 arpens, bounded on the east by vacant land in a line with eastern boundary line of the Grand Prairie, north by the field lot formerly owned by Rondo, west by vacant land in a line with the western boundary of the Big Prairie field, and south by the field lot formerly owned by Baptiste Corneau.

Survey No. 1814 of the confirmation to the legal representatives of Baptiste Riviere *dit* Baccanet, made by Cozzens at the time of the one last named, and also approved by the surveyor-general.

Spanish concession to Wm. Bizet, dated February 7, 1769, of one arpen in width by forty deep, in the *cul de sac* of the Grand Prairie, adjoining on the one side of the land of Baccanet, and on the other of Kunz des Noyers.

General notice to F. Bates, recorder of land titles, dated the 28th of November, 1812, by Riddick, Chouteau and others, to record the concessions in Livres Terreins Nos. 1, 2, 3, 4, 5 and 6, which is followed by said concession to Bizet in the original French. This is under acts of Congress (section 7 of the act of June 13, 1812).

Confirmation papers of this claim by last board of commissioners; also act of Congress of July 4, 1836.

Act of Congress of April 29, 1816 (3 U. S. Stat. at Large, 329), and confirmation of this claim by Recorder Bates.

Survey No. 3340 of this confirmation, approved September 6,

1855.    The east front line of this survey is the same as the east front line of the common fields, extending in a straight line southwardly from the aforesaid field lot of Mainville Deschenes, and is not set back.

Defendant also gave in evidence confirmation papers and survey of field lot in Grand Prairie to the legal representatives of Louis Laroche, and also confirmation papers and surveys of several other common-field lots having their east front lines continuations of a straight line extending southwardly from the east front line of Mainville Deschenes' lot.

Defendants then gave evidence (documentary) to show their derivative title from the aforesaid confirmees.

Defendants also gave in evidence a large number of Spanish concessions from Livres Terreins, numbers one and two of common-field lots, in order to show the existence in Spanish times, and prior to the 20th of December, 1803, of a common field in Grand Prairie belonging to the town of St. Louis, and its boundaries and extent, and the shape, size and relative situations of the lots conceded.  The defendants rested, and the plaintiffs, in rebuttal, gave in evidence the letter of instructions of the 20th of May, 1857, from surveyor-general to Cozzens, and the surveys made thereunder, by which the Bouis, Baccanet and Bizet surveys are set back nine arpens and thirty-six French feet; and the explanations of Cozzens in reference thereto.

Plaintiffs also put in evidence a copy of Hunt's minutes as to the claim of Louis Laroche, embracing the testimony of Baptiste Riviere *dit* Baccanet regarding that claim.   Plaintiffs also put in evidence a deed of the defendants *inter partes*, for the partition among themselves of the premises in dispute.

The plaintiffs here closed, and the defendants gave in evidence certain statements, under oath, of ancient witnesses (Baptiste Riviere *dit* Baccanet and Rene Dodier) before Recorder Hunt, showing cultivation, location, etc. ; also letter of instruction from the commissioners of the general land office to Surveyor-General Loughborough, dated November 27, 1856, which adopts the recommendations of the report to him by Loughborough of the 30th of January, 1855, not to disturb the surveys theretofore made

by Cozzens.   The evidence being all in, upon the prayer of the plaintiffs against the objections of the defendants, the court gave the following instructions:

1.  The court instructs that if the land in controversy was surveyed by the United States in the year 1818, as section 16, township 45, range 7 east of the fifth principal meridian, and designated as such by metes and bounds specifically locating the same, which metes and bounds have been identified by the evidence in the case, the act of Congress of the 6th of March, 1820, and the ordinance of the people of Missouri of July 19, 1820, and the act of the Legislature of Missouri of March 3, 1851, and the order of the County Court of 1853 (if genuine), all of which have been read in evidence, constitute a right and title in the plaintiffs which, in the absence of any opposing title emanating from the United States prior to July 19, 1820, will enable plaintiffs to recover the land sued for, and rents and profits.

2.  The court instructs that the alleged confirmation to Bouis by act of Congress of June 13, 1812, set up by defendants, is no defense to the plaintiffs' action, unless it has been shown (1) that prior to December 20, 1803, said Bouis inhabited, cultivated or possessed, and claimed as owner, some particular common-field lot in the common fields of the Grand Prairie belonging to the village of St. Louis; and (2) that the metes and bounds of the same identical field lot have been shown to the court, specifically locating said lot, or part of it, within the survey of said section sixteen as put in evidence by plaintiffs; and the court further instructs that the calls in Recorder Hunt's certificate in respect to said lot of Bouis are insufficient specifically to locate the same without proof showing the existence and place of the object called for on the ground, and there is no such proof in the cause; and the court further instructs that if, prior to the final survey of said Bouis' claim, the same was indefinite in regard to its location — that is, without metes and bounds ascertained by evidence in the cause — the survey of the claim of Bouis by the United States is not evidence of any title in said Bouis or his representatives, older than the approval of said survey.

3.  The court instructs that the alleged confirmation to Bac-

canet by act of Congress of June 13, 1812, set up by defendants, is no defense to the plaintiffs' action unless it has been shown (1) etc. The remainder of this instruction is precisely the same as instruction No. 2.

4. That in all cases where lands have been confirmed by the United States, but in such manner that the tracts remain without specific metes and bounds, and there is no evidence showing what specific land was confirmed; or wherever the metes and bounds mentioned in the confirmation either do not exist or are not proved, so as to show to what particular land the confirmation applied, no title to any land vests in the confirmee till a survey of the tract is finally made by the United States; and if, prior to the approval of such survey, the land covered by it has been granted to another person under any law of the United States, such prior grant is the better title.

5. There is no defense to the plaintiffs' action under any statute of limitations.

The defendants asked the following instructions, which were refused, and they excepted:

1. If the court shall find from the evidence that prior to the 20th of December, 1803, there was a series of lots of similar form and character, situated in the Grand Prairie in the neighborhood of the town of St. Louis, and lying adjoining to each other in the same general range of lots, and which said lots were used by the inhabitants of said town prior to said date for the purpose of cultivation, and that the premises in the possession of Peter Lindell at the commencement of this suit are within the out-boundary of said lots, then the plaintiffs cannot recover in this action against the defendants who have answered, although the court may also find from the evidence that said premises lie within and are a part of section 16 of township 45 north, range 7 east of the fifth principal meridian.

2. If the court shall find from the evidence that prior to the 20th of December, 1803, there was a series of lots of similar form and character, situated in the Grand Prairie in the neighborhood of the town of St. Louis, and lying adjoining to each other in the same general range of lots, and which said lots were

used by inhabitants of said town prior to said date for the purpose of cultivation, and that the premises in possession of Peter Lindell at the commencement of this suit are within an out-boundary of said lots, and within an out-boundary which will include the said town of St. Louis and the out lots, common-field lots and commons thereto belonging, then the plaintiffs cannot recover in this action against those of the defendants who have answered, although the court may also find from the evidence that said premises lie within and are a part of fractional section 16, township 45 north, range 7 east, of the fifth principal meridian.

3. If the court shall find from the evidence that prior to the 20th of December, 1803, there was a series of lots of similar form and character, situated in the Grand Prairie in the neighborhood of the town of St. Louis, and lying adjoining each other in the same general range of lots, and used by the inhabitants of said town for the purposes of cultivation, and that the premises in possession of Peter Lindell at the commencement of this suit, and adjoining on the north the northern line of the United States survey No. 903, for widow Camp's legal representatives, are a part of such lots, and were cultivated by inhabitants of said town prior to the 20th of December, 1803, as such lots, then the plaintiffs cannot recover in this action, although the court may also find that said premises lie within section 16, township 45 north, range 7 east of the fifth principal meridian.

4. If the court shall find that a tract of land of which the premises in possession of Peter Lindell at the commencement of this suit are a part, was cultivated by Vincent Bouis prior to the 20th of December, 1803 ; that said Bouis was at the time of such cultivation an inhabitant of the town of St. Louis ; that said tract was situated in the Grand Prairie in the neighborhood of said town, and was used by said Bouis for the purposes of cultivation, and was one of a series of lots of similar form and character, also made by inhabitants of said town for the purposes of cultivation, and lying adjoining to each other in the same general range of lots, then the plaintiffs cannot recover as to said part, although the court may believe from the evidence that the same lies within section 16, township 45 north, range 7 east of the fifth principal meridian.

5. A similar instruction as to the lot cultivated by Baptiste Riviere *dit* Baccanet.

6. If the United States survey No. 1813 of the confirmation to Vincent Bouis or his legal representatives, under Pierre Chouteau, given in evidence by the defendants, was made by a deputy surveyor, under the surveyor of the lands of the United States, for Illinois and Missouri, pursuant to written instructions which had by him been furnished to said deputy, and the same was by the latter returned to the office of said surveyor, and was by him approved and recorded, then the same could not be legally changed nor a different survey of said confirmation be made, to the prejudice of the legal representatives of said Bouis, claiming under said survey, without previous notice thereof to them; and there is no evidence in this case of such notice.

7. A similar instruction as to survey No. 1814 of the confirmation of Baptiste Riviere *dit* Baccanet.

8. A similar one as to entry No. 3340 of the confirmation to Guillaume Bizet or his legal representatives.

Defendant also asked the following instructions, which were refused:

(*a*) The common-field lots of the Grand Prairie common fields of St. Louis that were cultivated by any of the inhabitants of St. Louis prior to the 20th of December, 1803, were confirmed and granted to the several inhabitants so cultivating such common-field lots by the act of the 13th of June, 1812; and said grant took effect on the 13th day of June, 1812, according to the boundaries of the respective cultivations of said inhabitants, and passed the title immediately to the said respective inhabitants. All the field lots in said Grand Prairie that were not cultivated by any of the said inhabitants of St. Louis prior to the 20th day of December, 1803, were reserved for support of schools in said village of St. Louis.

(*b*) If the court, stting as a jury, finds from the evidence that the common-field lots of the Grand Prairie, from the lot of Motard on the south to the St. Charles rock road on the north, were cultivated in regular succession of lots, adjoining each other on a straight front line, by several of the inhabitants of St. Louis prior to the 20th day of December, 1803, then the said inhab-

Glasgow et al. v. Lindell's Heirs.

itants were respectively confirmed in their several titles to said field lots without any condition of survey by the United States; and the grant of the 6th of March, 1820, does not and did not take effect upon any portion of said common fields so cultivated by said inhabitants of St. Louis before 1803.

(c) All the common-field lots of the Grand Prairie of St. Louis, if they were cultivated for several years prior to the 20th day of December, 1803, by inhabitants of St. Louis, as field lots belonging to St. Louis, were granted by the act of Congress of the 13th of June, 1812, to said inhabitants of St. Louis respectively on the said last named day and year; and the grant of the 6th of March, 1820, accepted by the convention of Missouri in July, 1820, did not and does not take effect upon any portion of the land lying within the out-boundary lines of said common-field lots as they existed and were cultivated prior to the 20th day of December, 1803.

(d) If the court, sitting as a jury, find from the evidence that the surveys of the Bizet, Baccanet and Bouis field lots, made under the instructions of May, 1846, and February 22, 1852, from the surveyor-general to Wm. H. Cozzens of St. Louis, at St. Louis, were made by said Cozzens in strict accordance with the ancient corner-stones of the field lots of the Grand Prairie, and upon the true lines of the out-boundary of said common-field lots as they existed in 1803 and prior thereto; and that said surveys of Cozzens were approved in 1855 by said surveyor-general and recorded in the records of his office; and if the court further finds that the subsequent surveys of said Cozzens in 1857, under instructions of 1857, located the eastern line of the Grand Prairie common fields south of Laroche, nine arpens and thirty-six feet west of the true and ancient line of the eastern front of said common fields as marked and fixed by Spanish stones, then the law is that the survey of 1855, of the ancient line of the eastern front of said common fields, is to be preferred to the survey of 1857, or any other prior surveys on a new line different from that existing in Spanish times.

(e) The court declares the law to be that if the instructions marked A and C are given for the defendants, then no title can

vest in the plaintiffs by the force of the act of Congress of 1811, or of the 6th of March, 1820, for the reason that the lands sued for, if within the ancient boundary lines of the Grand Prairie common fields of St. Louis, had been otherwise disposed of prior to the passage of said act of 1820, and prior to the pretended survey by Brown of 1818.

(f) The field-notes of survey by Brown of 1818 have no authority or validity unless they were made under instructions from the surveyor-general, and were approved and platted in the surveyor-general's office after the survey was executed; and the said pretended survey of Brown, if valid, had no power to vest any title in the State for the use of schools for any land lying within the Spanish lines of boundary of the Grand Prairie common-field lots of St. Louis.

1. The first question raised by this record is the right of the plaintiffs to maintain this suit. This question is presented by the two instructions asked by the defendants at the close of the plaintiffs' case in chief, and also by the first instruction given for plaintiffs.

It may be observed that this litigation was commenced almost twenty years ago, and the same plaintiffs have maintained suits as commissioners, under the act of the general assembly of 1851, against various parties, both in the Circuit and Supreme Courts, and their right to do so has been acquiesced in *sub silentio*. In all the cases it has been assumed without discussion that these commissioners had the right to sue in their own names. In the case of Milburn *et al*. v. Hortiz, 23 Mo. 532, no question of this kind was thought of, either by the counsel who argued the case or by the court, although the plaintiffs could have had no standing in court except by virtue of the authority conferred on them by the act of 1851. And the same may be said in regard to the cases of Milburn *et al*. v. Hardy, Milburn *et al*. v. Carpenter, Milburn *et al*. v. Blanchard, Milburn *et al*. v. McClure, and same v. Hogan, 28 Mo. 514–23. In these last cases the point was distinctly made in the instruction given by the Circuit Court on its own motion, and it was assumed to be correct without discussion, both in the Circuit and Supreme Courts. We do not feel

at liberty to disturb this construction after so long an acquies-
cence by the bench and bar. Besides, we think the language of
the act expressly confers upon the commissioners to be appointed
by the County Court authority to take possession of the sixteenth
section. It does not give them any title to the land or any right
to the possession except as agents of the State. By suing in their
own names in ejectment, they are merely executing a statutory
power to obtain the possession. It is doubtless true at common
law that a plaintiff in ejectment can only recover on his own right
to the possession. He cannot authorize an agent to sue in his
own name. The suit must be in the name of the principal. But
is there anything to prevent the Legislature from passing a law
authorizing agents created for that purpose to sue in their own
names?

The act of 1851 was passed under the old constitution, allow-
ing special acts to be passed. It has not been expressly repealed
that we are aware of by any subsequent act, nor has it been
repealed by implication. Repeals by implication are not favored
or allowed unless the first act be so inconsistent as not to stand
with the subsequent act. Under this view the instructions asked
by the defendants at the close of the plaintiffs' case in chief were
properly refused, and the first instructions for plaintiffs were right-
fully allowed.

2. The next point in this record arises on the case made by
the defendants, which the court, by instructions given for the
plaintiffs, and instructions prayed for by the defendants and
refused by the court, entirely excluded from the jury.

The defendants rested their defense on the title to the common-
field lots of the Grand Prairie of the town of St. Louis, as being
a better title than the title to the sixteenth section, vested in the
State under the act of Congress of the 6th of March, 1820, and
the acceptance of this grant by ordinance passed by the conven-
tion of Missouri in July, 1820. It may be considered as the
settled construction of the act of Congress of the 13th of June,
1812, that by its own terms this act vested in each inhabitant of
the town of St. Louis the absolute title in fee to the common-
field lot which he possessed or cultivated prior to the 20th of

December, 1803. This has been the uniform course of decisions by our own Supreme Court, and their decisions have been ratified by the Supreme Court of the United States, whose opinions in the construction of statutes passed by Congress ought, in my judgment, to be conclusive upon the State courts. There was no condition of survey necessary to vest the title. It was vested by the force of the act itself from the time of its passage. These field lots consisted of oblong parallelograms adjoining each other and having common eastern and western boundary lines. The eastern and western boundaries seem to have been well established and defined by Spanish stones, with cinders under them, placed along these lines in Spanish times for that purpose. The lines separating the lots were not so defined, but each cultivator cultivated his lot up to and adjoining his neighbors' lots on the north and south, and thus lines were indicated which separated the lots from each other. These common-field lots, therefore, existed in point of fact with boundaries upon the ground; and as they so existed, they were confirmed to the cultivators by the act of Congress of the 13th of June, 1812. As there was no condition of survey attached, the surveyor-general had no power to survey the claimants into their lots or out of them. If, however, he assumed to survey any of the lots by the metes and bounds as they existed in Spanish times, such surveys would be evidence, not to establish but to ascertain the lots as originally defined upon the ground. But in making such surveys he must be governed by the old Spanish monuments upon the ground, and when he undertakes arbitrarily to push back the lots from the original boundaries, as was done by the surveys made in 1857, such surveys are not binding upon the claimants. I may say, further, that the proposition assumed by the learned counsel for plaintiffs, in regard to the effect to be given to surveys of undefined tracts of land under acts of Congress confirming claims and requiring surveys, is not controverted here. In that class of cases no title passes till the survey is made, but a common-field lot does not belong to that class. It either exists upon the ground by defined limits, or it has no existence at all, and cannot be created by a survey.

Now the question arises, was there any evidence given in this case of the existence and boundaries of these common-field lots set up by the defendants, by title derived from the owners or as an outstanding title, and was there evidence to show that they had been cultivated or possessed prior to the 20th of December, 1803, by inhabitants of the town of St. Louis? In my judgment the evidence adduced strongly tended to show these facts, and the defendant's case, as made, ought not to have been withdrawn from the jury or the court sitting as a jury. The instructions, therefore, given for the plaintiffs, withdrawing the defendant's case from the jury, were improper.

In regard to the instructions prayed for by the defendants and refused by the court, I can see no substantial objections to them, except the two instructions marked A and E. Instruction A has appended to it a proposition that all the field lots in the Grand Prairie that were not cultivated by any of the inhabitants of St. Louis prior to the 20th of December, 1803, were reserved for the support of schools. This reservation is not properly stated in the instruction. Only such of the lots as might be assigned, not exceeding a certain amount, were so reserved. In regard to instruction E, it is bad because it left no facts to be determined by the court sitting as a jury. It assumed all the facts in instructions A and C to be true, and left nothing to be passed on by the jury.

The objection that the defendants' instructions embraced confirmations *en masse* is a criticism upon the language of the instructions rather than a substantial objection. The instructions, in my opinion, do not bear that construction. They were intended to enunciate the proposition that each inhabitant of the town of St. Louis cultivating or possessing a common-field lot prior to the 20th of December, 1803, was confirmed in his title to such lot by the act of Congress of the 13th of June, 1812. The defendants had a right in their defense to invoke these outstanding titles to defeat the plaintiffs' action. The titles so emanating by act of Congress of the 13th of June, 1812, or emanating by act of Congress of April, 1816, were older and better titles than the title of the State to section sixteen, which was granted in 1820.

6—VOL. L.

In support of the views here laid down, we refer to the many cases heretofore decided by this court, and especially the cases of Page v. Schibel, 11 Mo. 167 ; Milburn v. Hortiz, 23 Mo. 536 ; Milburn *et al.* v. Hardy, 28 Mo. 514 ; Vasquez v. Ewing, 42 Mo. 247; also the following cases in the United States Supreme Court: Guitard v. Stoddard, 16 How. 508 ; Glasgow *et al.* v. Hortiz *et al.*, 1 Black, 595. It is urged that the defendants' instructions do not use the word "claim" as well as "cultivate or possess." I am unable to see the force of this objection. It strikes me that if an inhabitant of St. Louis cultivated or possessed a common-field lot prior to the 20th of December, 1803, the presumption is that he did so as owner and not as a trespasser, and such cultivation or possession is the strongest evidence of ownership.

It was also suggested that the defendants were estopped by their deed of partition to claim or set up title to any land outside of the surveys of 1867, it being alleged that those surveys are recognized by that deed. That deed purported to divide among themselves by partition certain lands therein described. Does it follow that they thereby renounced any title that they may have had to lands not embraced in the deed? It is not pretended that the State was a party, or in any way interested in this deed of partition. Whatever may have been the effect of that deed as between the parties thereto, are they estopped in this action to set up their title to land which was not, in point of fact, embraced in that deed, or are they estopped thereby to set up an outstanding title older and better than that of the State? I am inclined to think the doctrine of estoppel does not apply to this case.

The judgment of the General Term of the Circuit Court is affirmed, and the cause remanded for further proceedings at special term. The other judges concur.